# DEPARTMENT OF EDUCATION, EDUCATION PRACTICES COMMISSION v FERRELL

## Case No. 87-5482

State of Florida, Division of Administrative Hearings

May 4, 1988

## APPEARANCES OF COUNSEL

**Lane T. Burnett,** for petitioner.

**Jack E. Ferrell,** *pro se.*

## OPINION OF THE COURT

DONALD R. ALEXANDER, Hearing Officer.

### RECOMMENDED ORDER

Pursuant to notice, the above matter was heard before the Division of Administrative Hearings by its duly designated Hearing Officer, Donald R. Alexander, on March 22 and 23, 1988 in Miami, Florida.

### BACKGROUND

By administrative complaint filed on November 10, 1987, petitioner, Department of Education, Education Practices Commission, alleged

that Respondent, Jack E. Ferrell, certified as a teacher, had violated Subsections 231.28(c) and (h), Florida Statutes (1987), and Rule 6B-1.006(3)(a) and (e), Florida Administrative Code (1987), by virtue of using inappropriate corporal punishment on a student and using a racial epitaph towards that student on December 20, 1985, by failing to comply with "administrative directives" on previously undisclosed dates, and with having been suspended from school for ten working days in school years 1981-82 for immorality and misconduct. By amended complaint filed on March 8, 1988, petitioner added the charge that Ferrell used derogatory language towards a black student on January 9, 1986, and that he was guilty of misconduct on at least five occasions between May 4, 1982 and January 9, 1986.

Respondent requested a formal hearing to contest the above allegations. The matter was referred by petitioner to the Division of Administrative Hearings on December 11, 1987, with a request that a Hearing Officer be assigned to conduct a hearing.

By notice of hearing dated January 22, 1988 a final hearing was scheduled on March 22 and 23, 1988 in Miami, Florida. At final hearing, petitioner presented the testimony of N.W., J.R., A.M.K. and J.W., all former students of respondent, Ella Walker, Kenneth Jaworski, assistant principal at Hialeah Senior High School, Dr. James E. Monroe, director of the Dade County School Board's office of professional standards, and Fred Damianos, principal of Parkway Middle School. It also offered petitioner's exhibits 1-11. All exhibits were received into evidence. Respondent testified on his own behalf and offered respondent's exhibits 2 and 3. Both exhibits were received in evidence.

The transcript of hearing (three volumes) was filed on April 13, 1988. Proposed findings of fact and conclusions of law were filed by petitioner on April 28, 1988. None were filed by respondent. A ruling on each proposed finding of fact is contained in the Appendix attached to this Recommended Order.

At the conclusion of the hearing, petitioner *ore tenus* moved to amend the complaint to include the charge that respondent's effectiveness as a teacher had been impaired. A ruling on this motion was reserved.

At issue is whether respondent should have his teacher's certificate disciplined for the reasons stated in the Amended Administrative Complaint.

Based upon all of the evidence, the following findings of fact are determined:

200

## FINDINGS OF FACT

### A. *Introduction*

1. At all times relevant hereto, respondent, Jack E. Ferrell, was a teacher at Parkway Junior High School (PJHS) in Miami, Florida. He holds Florida Teacher's Certificate Number 107694 issued by petitioner, Department of Education, Education Practices Commission (Commission). The certificate was reissued in 1987 and covers the areas of health education, physical education and mathematics.

2. With the exception of a short break in the 1960s, respondent has been a teacher in Dade County, Florida since 1959. He taught at PJHS from school year 1967-68 until January 10, 1986 when he was reassigned to administrative duties at a Dade County School Board area office. The school has a racial composition of at least ninety percent black students. On February 18, 1986, Ferrell retired rather than face disciplinary action by the Dade County School Board which might have culminated in his dismissal and loss of retirement benefits. As a condition of accepting his resignation, the School Board stipulated that Ferrell would not be rehired by that school district. At the same time, the charges which prompted his retirement were referred to the Commission. On November 10, 1987, or some twenty-one months later, an administrative complaint was issued against Ferrell charging him with various violations of general law and agency rules. As amende on March 8,1988, the complaint alleges that Ferrell, who is white, (a) used excessive corporal punishment on a black student and called that student a "nigger" on December 20, 1985, (b) called a black student a "dummy, gorilla and nigger" on December 18, 1985, (c) showed unprofessional conduct at a parent-teacher conference on December 19, 1985, (d) failed to follow school policies and procedures, used unprofessional conduct and defied school personnel, all of which resulted in a letter of reprimand on April 15, 1985, (e) argued with a fellow teacher on June 5, 1984, (f) was guilty of direct insubordination by refusing to accept a student into his classroom on December 14, 1984, and (g) committed battery upon another teacher on April 23, 1982.[1] These charges will be discussed separately hereinafter.

### B. *The December 20 Incident*

3. On December 20, 1985 Ferrell was teaching a mathematics class when J.W., then a fourteen year old black student, was brought to his classroom by Mr. Robertson, a school security guard. The student had

---

[1] Many of the dates used in the amended complaint were incorrect. These were corrected during the course of the hearing, and the correct dates are reflected above.

been caught skipping class earlier and was sent to Roy Scott, an administrative assistant, who gave a "shot" (paddling) to J.W. and several other students. When J.W. entered Ferrell's class, Ferrell asked him "What happened to you?" J.W., who was upset and teary eyed from his paddling, responded "I just got a shot." Ferrell replied "You should have been suspended." J.W. then said words to the effect "Don't worry about me," and went to his desk which was in the back corner of the classroom. Ferrell, who did not hear J.W.'s last remark, asked "What did you say?" When J.W. did not respond Ferrell went to the student's desk and lifted it slightly once or twice and again asked him to repeat his comment. J.W. would not respondent and told Ferrell to leave him alone. Using both hands, Ferrell picked up J.W. by his shirt and asked him to repeat his comment. During the process of picking up J.W., Ferrell's hands ended up around the upper chest area or lower part of J.W.'s neck. J.W., who by now was angry and even more upset, tried to break loose but Ferrell pushed him against the wall resulting in J.W. accidentally bumping his head. After Ferrell asked J.W. what he intended to do, J.W. threatened to tell his mother but Ferrell replied that he didn't care. When J.W. again attempted to break away, Ferrell pushed him against the wall a second time. At that point, Ferrell thought he heard J.W.'s shirt tear and released the student. He told a security guard to take J.W. to the principal's office. He later gave J.W. a detention for coming to class without a book. Although at hearing J.W. claimed that Ferrell had called him a "nigger" and "boy," this contention is rejected since J.W. did not allege this in his initial statements and interviews, and nearby students who witnessed the event did not hear Ferrell use those words.[2]

4. After J.W. related the event to the school administrators, the administrators concluded that J.W. was "okay," and he was sent to his next class, a physical education class. During the interview, one of the school officials noted a small bump on the back of J.W.'s head where it had struck the wall and accordingly reported Ferrell to the Department of Health and Rehabilitative Services for child abuse (excessive corporal punishment). However, there is no evidence that formal charges were ever filed against Ferrell by the agency or state attorney. According to J.W., the bump "hurt" and stayed on his head for "about a week." However, he did not ask for nor was he given medical assistance for his injury. In a meeting later that day, Ferrell admitted

---

[2] Testimony by another student, A.M.K., that she "thought" she heard Ferrell use the word "boy" has been considered but found to be insufficient to support a finding, particularly since A.M.K. failed to include this allegation in her first statement given on January 8, 1986 or in a second statement made on September 9, 1987.

202

to the assistant principal in charge of administration, Kenneth Jaworski, that he had pushed J.W. against the wall, that the child may have bumped his head, and that his hands may have slid up around J.W.'s throat area. At that time, Ferrell blamed the incident on a "wise" statement made by the student. In early January, 1986, or some two to three weeks later, school officials contacted J.W.'s mother and told her of the incident.

5. According to school policy, a teacher should never place his hands on a student unless he is in fear of bodily harm from a student or unless a student is about to inflict bodily harm on another student.[3] Since neither situation was present, Ferrell violated school policy. Had Ferrell considered J.W.'s conduct to be disruptive or defiant, Ferrell should have either referred him to the principal's office or contacted a security guard who would escort J.W. to the principal's office. These procedures are outlined in the faculty handbook, and Ferrell was aware of such policies. Finally, under School Board Rule 6Gx13-5D-1.08 appropriate corporal punishment was considered to be paddling. If corporal punishment was justified, only two persons designated by the principal at PJHS were authorized to administer such punishment and then only under certain conditions prescribed within the rule. Ferrell was not one of the two designated hitters.

6. At hearing, Ferrell contended that he was simply "restraining" J.W. when the student attempted to leave the room and that he did not physically pull the student up with his hands or deliberately shove his head against the wall. He did concede it was possible that J.W.'s head could have accidentally hit the wall during the confrontation. Ferrell strong disagreed with the contention that his actions equated to excessive corporal punishment and characterized it instead as an effort on his part to restrain the student from leaving class. It was his contention that the definition of corporal punishment was vague but was generally interpreted only to be paddling. He also said his actions were necessary in order to maintain control and discipline in his classroom.

## C. *The December 18 Incident*

7. During the first semester of school year 1985-86, N.W. was a twelve year old black student at PJHS enrolled in Ferrell's sixth period mathematics class. Around 7:00 a.m. on the morning of December 18, N.W. was standing with two other black female students outside the

---

[3] A teacher is allowed to place his hands on a student for "directional" purposes. However, this exception has no relevance to the factual situation presented herein.

school building when Ferrell walked by on the way into his classroom. There may have been as many as ten or twenty other black students who were within hearing distance of Ferrell but the exact number, if any, is unknown. One of the students, S.W., called out to Ferrell "Do you have a brother named Fred?" Ferrell replied "No, do you have a brother named Dummy?" He also asked S.W. if she was in his class. The student then retorted "No, but you remind me of Fred Flint-stone." Ferrell replied "You remind me of a nigger." The evidence is conflicting as to whether Ferrell used the word "gorilla" during the incident, but it is found he did not. N.W. told her mother of the incident that day. Even though she was extremely upset with Ferrell, the mother chose not to bring the matter up until after the Christmas holidays.

8. On January 9, 1986, N.W.'s mother met with Ferrell and a counselor, who was also black, to discuss her daughter's poor grades and the name-calling incident that occurred on December 18, and to request that her daughter be transferred out of Ferrell's classroom. At the conference, Ferrell acknowledged to both N.W. and the counselor that he had used the word "nigger." However, he explained that he was from North Carolina, that the word was always used to describe blacks and that the term was not used in a derogatory sense.

9. In a conference with the principal, Fred Damianos, Ferrell freely admitted he had used the word "nigger" in his exchange with the three black students but, as he had told the mother, stated the word was a common one in North Carolina and was not meant to be derogatory. The principal did not consider this to be justification for his conduct and had a letter of reprimand placed in Ferrell's file. At hearing, Ferrell agreed his use of the word showed a lack of good judgment and could have offended the students in question.

## D. *Direct Insubordination*

10. On December 14, 1984 Ferrell sent N.C., a female student, to Jaworski's office for using profanity in class. She had already been sent out of class on several prior occasions for disciplinary reasons. Ferrell did not want her back in class until after a parent-teacher conference had been held. However, Jaworski was "extremely busy" at the time and sent her back to the classroom with a note requesting that Ferrell take her, and they would talk about the student's situation later on. When N.C. returned to his class, Ferrell refused to accept her and sent her back to Jaworski's office with a note saying he would not admit her.

11. Jaworski considered Ferrell's refusal to accept N.C. to be in

defiance of his authority and therefore direct insubordination. Jaworski explained that, under then-existing school procedures, if the student continued to be a disciplinary problem, Ferrell should have prepared another referral slip rather than simply refusing to accept her. Jaworski discussed the incident with Ferrell that afternoon and later placed a memorandum describing the matter in Ferrell's file. However, the memorandum did not constitute disciplinary action since Jaworski had no authority to discipline Ferrell.

12. Ferrell considered N.C. to be a persistently disruptive student who had to be removed from the classroom. He also felt his conduct in the matter was consistent with the school's Code of Student Conduct which authorized a teacher to temporarily remove that type of student from the classroom, request a parent-teacher conference, and to send the student to a predesignated area determined by the school principal. In Ferrell's view, Jaworski overreacted to the situation and had failed to give consideration to all the facts before the memorandum was written.

### E. *Angry Parent-Teacher Conference*

13. On December 19, 1985, Ferrell had a parent-teacher conference with a Mr. and Mrs. Sterling and a school counselor. The conference concerned the Sterlings' son, R.S., who had been a disciplinary problem in one of Ferrell's classes. The mother carried a small baby with her to the conference. The four (plus baby) met in the counselor's 8' × 10' office which was approximately twenty feet from Jaworski's office. After the meeting had been underway for some time, another administrator asked Jaworski to check out the loud voices emanating from the counselor's office. When Jaworski went over to see what was happening, he found what he considered to be a "heated" meeting taking place. He described Ferrell's tone of voice as being loud and aggressive.

14. After a few minutes had passed, Ferrell stood up and, in an irritated manner, said words to the effect "I can't add anything else, I don't know what else to say" and departed the meeting. As Ferrell left, Mr. Sterling said he had heard that Ferrell was "prejudiced." Upon hearing this comment, Ferrell returned to the doorway and said "If you believe that, you're as immature as that baby." At that point Jaworski, who was still standing near the office, felt that there was going to be a physical confrontation between Ferrell and Mr. Sterling and placed his arm across the doorway to prevent Ferrell from entering the room. Ferrell then left the area. However, Ferrell did not "physically push" Jaworski as alleged in the complaint.

15. At hearing Ferrell admitted the conference "did not go well" and

205

that, at one point, he and Mr. Sterling may have been "trying to out talk the other." Ferrell's contention that he did not use "threatening" words at any time was corroborated by Jaworski. Ferrell also pointed out that between September 5, 1985 and January 10, 1986, he had twenty-six parent-teacher conferences and only this conference drew a complaint from administrators. Even so, Ferrell was cited for unprofessional conduct in a memorandum prepared by Damianos on January 9, 1986.

### F. *Battery on a Teacher*

16. On April 23, 1982 Ferrell was involved in an altercation with another teacher named Bellis. The incident occurred around 9:00 a.m. that day when some students left Bellis' classroom and congregated in the hallway outside of Ferrell's classroom. Because this disturbed his class, Ferrell first complained to Bellis, who did nothing about the matter. Ferrell then complained to the principal (Mr. Hanna). A short time later, the three men met in the hallway in front of Ferrell's classroom and, when Bellis turned and began walking away, Ferrell grabbed his upper bicep and told Bellis to turn around and tell Hanna the truth about the situation. Because Ferrell had touched him, Bellis filed criminal battery charges against Ferrell. However, there is no evidence that Ferrell was ever prosecuted for this crime. Even so, Ferrell was administratively charged with battery by school administrators and was suspended from school without pay for ten days. Ferrell contends he accepted the punishment only because he was promised a reassignment to another school. The promised reassignment did not materialize.

### G. *Failure to Follow School Policy, Etc.*

17. The complaint alleges that Ferrell was guilty of "tearing up three discipline referrals in front of (Damianos) during a fit of anger." In the spring of 1985, a new countywide school policy was implemented requiring teachers to contact the student's parents before referring the student to the principal's office for "minor infractions." This policy was explained to all PJHS teachers, including Ferrell, at a faculty meeting on March 26, 1985. However, Ferrell had referred three students to the principal's office during the week preceding the meeting without first making such parent contact. By March 27, Ferrell had contacted the three sets of parents, albeit after the referrals had already been sent to the principal's office. On March 27, Ferrell and Damianos met in the school cafeteria to discuss the three referrals and the need to follow the new procedure. When the meeting ended, Ferrell was "upset," but not in "a fit of anger," and as he walked out of the cafeteria, he tore up the

**206**

referrals and threw them in a wastebasket. Damianos considered this to be "unprofessional conduct" and "immature" and Ferrell's way of showing the administration that he was "upset."

18. Ferrell justified his tearing up the forms on the ground the forms were no longer necessary since they failed to comply with the new school directive. He added that he meant no disrespect towards Damianos.

19. Ferrell admitted being late to his classroom a few times in the spring of 1985 due to heavy traffic and parent-teacher conferences that lasted beyond the school starting hour. He also acknowledged that he had told another teacher (Scott) that Jaworski was "fat and lazy." In hindsight, Ferrell realizes he may have been "a little off base" for doing so. Unfortunately for Ferrell, his comments were relayed to Jaworski.

20. Ferrell was charged with having received a letter of reprimand dated April 15, 1985 for various matters, including those discussed in findings of fact 17-19. He was also placed on two weeks' prescription in May, 1985 and satisfactorily completed all conditions by the prescribed time. Other than Ferrell's admission of being late, calling Jaworski certain names, and tearing up the three referral forms, there was insufficient evidence to support findings concerning any other incidents which form the basis for the reprimand and prescription.

## H. *Incident on May 4, 1984*

21. The complaint charges that Ferrell and Bellis supposedly had another altercation on June 4, 1984 albeit one of a purely verbal nature. No specifics are of record, and Ferrell's contention that he was completely exonerated was not contradicted. Indeed, the assistant principal did not dispute this contention and admitted that Bellis was an "unusual" person who had a tendency to lie.

## I. *Loss of Teacher Effectiveness*

22. According to the testimony of various administrators, Ferrell's conduct in its totality, if shown to be true, has resulted in the loss of his effectiveness as a teacher in the public school system.

## J. *Ferrell's Case*

23. Ferrell contended that all allegations were either untrue or exaggerated. He suggested the School Board of Dade County began compiling a paper trial in 1984 in an effort to dismiss him. According to Ferrell, this began when Ferrell met with the area superintendent in July, 1984 after the second Bellis incident. The superintendent told him that if one more incident occurred, Ferrell was "through as a teacher

in Dade County." Ferrell also attributed many of his problems to a personality conflict with Jaworski and Damianos.

24. Ferrell admits that he is a strict disciplinarian in class and assigns a great deal of homework. As a result, he is unpopular with many students. Ferrell's reputation as a strict disciplinarian was corroborated by one administrator who described Ferrell's class discipline as "extremely good." Ferrell also described himself as "blunt," "frank," "to the point," and "very firm" in dealing with students, parents and teachers. However, these characteristics have tended to cause strained relations with his counterparts. Except for the December 18, 1985 incident, Ferrell denies every using derogatory terms during his lengthy school tenure. This was corroborated by Jaworski and Damianos to the extent that they had contact with Ferrell while they were at PJHS. Indeed, they stated that Ferrell never gave any prior hint of racial bias. Ferrell was also described as an adequate teacher in terms of teaching skills as evidenced by his continuous receipt of satisfactory annual evaluations during his tenure with the school sytem. Further attributes included his never being absent and a willingness to stay after regular school hours to tutor students. Finally, Ferrell was offered the opportunity by Damianos in both 1984 and 1985 to teach extra classes because of the principal's confidence in his capabilities.

25. Ferrell has not taught since his retirement in February, 1986 but wishes to retain his teacher's certificate. He thinks revocation of his certificate is too harsh a penalty given his otherwise satisfactory twenty-five year tenure as a teacher.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction of the subject matter and the parties thereto pursuant to Subsection 120.57(1), Florida Statutes (1987).

2. By the amended administrative complaint, petitioner contends that respondent, through his conduct, has violated Subsections 231.28(c) and (h), Florida Statutes (1987), and Rule 6B-1006(3)(a) and (e), Florida Administrative Code (1987). The statute and rule read as follows:

231.28 Education Practices Commission; authority to discipline.—

(1) The Education Practices Commission shall have authority to suspend the teaching certificate of any person as defined in § 228.041(9) or (10) for a period of time not to exceed 3 years, thereby denying that person the right to teach for that period of time, after which the holder may return to teaching as provided in

208

subsection (4); to revoke the teaching certificate of any person, thereby denying that person the right to teach for a period of time not to exceed 10 years, with reinstatement subject to the provisions of subsection (4); to revoke permanently the teaching certificate of any person; or to impose any other penalty provided by law, provided it can be shown that such person:

\* \* \*

(c) Has been guilty of gross immorality or an act involving moral turpitude;

\* \* \*

(h) Has otherwise violated the provisions of law or rules of the State Board of Education, the penalty for which is the revocation of the teaching certificate.

\* \* \*

6B-1.006 Principles of Professional Conduct for the Education Profession in Florida.

(1) The following disciplinary rule shall constitute the Principles of Professional Conduct for the Education Profession in Florida and shall apply to any individual holding a valid Florida teacher's certificate.

(2) Violation of any of these principles shall subject the individual to revocation or suspension of the individual teacher's certificate, or the other penalties as provided by law.

(3) Obligation to the student requires that the individual:

(a) Shall make reasonable effort to protect the student from conditions harmful to learning or to health or safety.

\* \* \*

(e) Shall not intentionally expose a student to unnecessary embarrassment or disparagement.

\* \* \*

The amended complaint alleges that respondent is guilty of gross immorality or an act involving moral turpitude and that he has violated the cited portions of the rule. Because respondent's teaching certificate is subject to revocation, these allegations must be proven by clear and convincing evidence. *Ferris v Turlington,* 510 So.2d 292 (Fla. 1987).

3. Initially, petitioner's request to amend its complaint to add the additional charge of violating Subsection 231.28(f), Florida Statutes

(1987), must be addressed. That subsection makes it unlawful for a teacher to be found guilty of "personal conduct which seriously reduces that person's effectiveness as an employee of the school board." The request was made after both parties had rested their respective cases and was presented under the theory that the amendment was necessary to conform the pleadings to the proof.

As a general rule, such a request is routinely granted in civil actions under Fla. R. Civ. P. 1.190(b) if the merits of the action can be more effectively presented by the amendment, and the objecting party is not prejudiced in presenting his case. Moreover, the amendment must not state a new cause of action. There is also a requirement that the opposing party object to evidence not within the pleading issues at the first opportunity and repeat the objection at each opportunity thereafter. Here, no objection was made, presumably because respondent is a lay person and lacked knowledge as to legal technicalities. However, the admission of the testimony did not raise a new cause of action nor appear to prejudice respondent's case. Moreover, respondent was allowed to thorough cross-examine each witness who raised the new matter. Therefore, the request to amend the complaint is granted.

4. Ferrell is charged with seven instances of misconduct over a four and one-half year period. Taking these charges in order found in the amended complaint, the evidence supports the following conclusions:

(a) On May 4, 1982 Ferrell placed his hand on the upper bicep of another teacher and was administratively charged with battery for which he received a ten-day suspension without pay.

(b) On December 14, 1984 Ferrell refused to readmit a student in his classroom after he had just referred the student to the assistant principal for using profanity in class. Although Ferrell had an instructive memorandum placed in his file, he was not formally disciplined for his conduct.[4]

(c) The charge that Ferrell was involved in an "incident" with another teacher (Bellis) on June 5, 1984 was not substantiated by clear and convincing evidence. Indeed, the record reflects that Ferrell was exonerated of this charge.

(d) As to the charge that Ferrell was guilty of "defiance of school

---

[4] Standing by itself, the conduct does not constitute gross insubordination within the meaning of Rule 6B-4.009(4), Florida Administrative Code (1987). For that offense to be present, there has to be "a constant or continuing intentional refusal to obey a direct order." Moreover, the agency has held that insubordination is *not* a ground for discipline of a teaching certificate. *Castor v Perry,* 9 FALR 5188 (DOE, August 26, 1987).

personnel authority, unprofessional conduct and failure to fellow (sic) school policies and procedures," the evidence is clear and convincing that Ferrell was late to work on a few unspecified occasions in the spring of 1985 and, on an undisclosed date, called Jaworski "fat and lazy" in the presence of another teacher. He also tore up three discipline referral slips in the presence of the principal while "upset" but not, as charged in the complaint, "during a fit of anger." The evidence is less than clear and convincing that Ferrell made "verbal and written refusals to contact parents on minor discipline referrals," that he pushed "the office door open in anger and (slammed) it into the wall," and that he was guilty of "losing (his) temper, yelling and displaying anger in the Student Services area in front of students, secretaries, teachers, and an Assistant Principal."

(e) There is clear and convincing evidence that on December 19, 1985 Ferrell exchanged words with a student's parents in a forceful and aggressive (but not threatening) manner during a parent-teacher conference. However, there is insufficient evidence that, during the conference, Ferrell "physically pushed the Assistant Principal."

(f) As framed in the amended complaint, it is charged that on December 20, 1985 Ferrell

had a disagreement (with a student). The Respondent walked over to the student's desk, kicked it and grabbed the student by the front of his shirt and pushed him to the corner. The Respondent kept pushing the student into the corner hard enough that it left a bump on the student's head. The Respondent used racial epitaphs by his statement to the student that he was a "nigger."

The evidence reflects that, although there was no "disagreement" between Ferrell and the student when the student entered the room, Ferrell followed the student to his desk because the student would not repeat a comment he had just made. Ferrell lifted the desk slightly once or twice but did not kick it. He then picked up the student by his shirt, and when the student twice tried to break away, Ferrell pushed him backward into the corner causing the student to accidentally bump his head. There is insufficient evidence that Ferrell used a racial epitaph as alleged in the complaint.

(g) The final charge is that Ferrell, "in the presence of other students and counselors, called a black student a 'dummy, gorilla and nigger.' " By clear and convincing evidence the Commission has proven that Ferrell made the following statement to a black student: "You remind me of a nigger." Although no counselors were present, the statement was made in the presence of two other black students and might have

been heard by others. He also asked the same student: "Do you have a brother named Dummy?" There is insufficient evidence that Ferrell used the word "gorilla" or any other derogatory term.

5. It is next necessary to determine whether the above conduct equates to gross immorality or an act involving moral turpitude within the meaning of Subsection 231.28(1)(c), Florida Statutes (1987), or constitutes a violation of Rule 6B-1006(3)(a) and (e), Florida Administrative Code (1987).[5] Gross immorality is not defined by statute. However, Rule 6B-4.009(2), Florida Administrative Code (1987), defines the term "immorality" as follows:

> (2) Immorality is defined as conduct that is inconsistent with the standards of public conscience and good morals. It is conduct sufficiently notorious to bring the individual concerned or the education profession into public disgrace or disrespect and impair the individual's service in the community.

Whether the statutory term "gross immorality" is the same as the term defined by agency rule has not been judicially determined. However, the fact that two different terms are used implies that gross immorality is more serious than immorality alone. *Cf. Smith v School Board of Leon County,* 405 So.2d 183, 185 (Fla. 1st DCA 1983) (charge of gross insubordination under § 231.36(6) imposed upon Board proof of a more serious degree of conduct than mere insubordination as then defined by Rule 6B-4.09(4), F.A.C.); *MacKillop v Castor,* 9 FALR 5254 (DOE, October 1, 1987). In addition, the Commission has recognized such a distinction and has held that there must be a "flagrant disregard of the proper moral standards" in order for a licensee's conduct to constitute gross immorality. *Education Practices Commission v Knox,* 3 FALR 13730A (DOE, June 29, 1981). Therefore, the undersigned will use a more stringent standard than is embodied in the rule to determine if a statutory violation has occurred.

6. The charge that Rule 6B-1.006(3)(e) has been violated is clear-cut. By using a racial epitaph towards a black student on December 18, 1985, Ferrell intentionally exposed a student to unnecessary embarrassment or disparagement. Although Ferrell claimed he did not intend to offend the student, he knew or should have known that the use of that word would cause embarrassment and disparagement on the part of the student. Therefore, Ferrell has violated both the foregoing rule and

---

[5] That portion of the statute dealing with "an act involving moral turpitude" is inapplicable since by rule the Commission has defined that term to require "a *crime*" on the part of the teacher. Rule 6B-4.009(6), F.A.C. (1987). Here such a crime was lacking.

212

Subsection 231.28(1)(h), Florida Statutes (1987), which makes it unlawful to violate a State Board of Education rule.

7. The Commission next charges that Ferrell violated Rule 6B-1.006(3)(a) by using excessive or inappropriate corporal punishment on student J.W. when he raised J.W. out of his chair by his shirt and twice pushed him against the wall when J.W. tried to break loose. Corporal punishment is defined in Subsection 228.041(27), Florida Statutes (1987), as follows:

> (27) CORPORAL PUNISHMENT.—Corporal punishment is the moderate use of physical force or physical contact by a teacher or principal as may be necessary to maintain discipline or to enforce school rule. However, the term "corporal punishment" does not include the use of such reasonable force by a teacher or principal as may be necessary to protect himself or other students from disruptive students.

Although the statutory definition is ambiguous at best and lacks specificity, by local school board rule the term has been defined to include only paddling and then only under certain conditions by specified individuals. By using "physical force" to "restrain" and push J.W., Ferrell failed to comply with local school board policy. But, the charge here is that Ferrell failed to "make (a) reasonable effort to protect (J.W.) from conditions harmful to . . . (his) health or safety" within the meaning of the rule.[6] Even so, the testimony supports a conclusion that the rule has been violated. Therefore, respondent is guilty of violating Rule 6B-1.006(3)(a) and Subsection 231.28(1)(h) as charged in the complaint.

8. It is next charged that Ferrell's conduct equates to gross immorality. Collectively, the conduct includes using a racial epitaph towards a student on one occasion, administering unauthorized corporal punishment to another student on one occasion, and the commission of a litany of minor transgressions. This latter group includes Ferrell's failure to admit a student to his class on one occasion in 1984, "battery" on a fellow teacher in 1982, being later to class a few times in the spring of 1985, displaying an argumentative attitude at a parent-teacher conference in December, 1985, tearing up three referral forms while upset and leaving a conference with his principal in March, 1985, and calling a fellow teacher "fat and lazy."

---

[6] Had he ˙been charged with violating a local rule, the Commission would have presumably relied on Section 231.09, F.S. (1987), which requires a teacher to follow all school board rules, or upon Rule 6B-4.009, F.A.C. (1987), which proscribes insubordination. See, however, footnote 4, supra.

9. With one exception, it is concluded that Ferrell's conduct did not constitute a "flagrant disregard of the proper moral standards." *Knox* and *Smith,* supra. As to the use of the racial epitaph, it is concluded that, even if Ferrell did not intend to use the term in a derogatory manner, and it may have been a onetime lapse in judgment, the use of the term was a serious and flagrant contravention of proper moral standards. Therefore, as to that specific act alone, Ferrell is guilty of gross immorality.

10. Finally, Ferrell is charged with having been guilty of personal conduct which seriously reduces his effectiveness as an employee of the school board.[7] Although the witnesses who testified as to this issue couched their opinions upon the premises that all charges herein were true, there is nonetheless a sufficient record basis to conclude that Ferrell has violated Subsection 231.28(1)(f), Florida Statutes (1987).

11. In his proposed order, Commission counsel suggests that Ferrell's teaching certificate be permanently revoked. This appears to be undersigned to be too severe a penalty given the otherwise unblemished twenty-five year plus teaching record of Ferrell spanning back to 1959. Prior agency precedent reveals that permanent revocation of a teaching certificate has been reserved for far more serious offenses such as using and selling drugs, sexual misconduct, administering repeated and severe corporal punishment, and gross incompetency.[8] In contrast, Ferrell used extremely poor judgment on one occasion each in administering inappropriate corporal punishment and using a derogatory term. However, these isolated lapses of good judgment, and the other minor matters that have been proven, pale in comparison to the previously cited offenses for which permanent license revocation has been imposed. In addition, Ferrell has not taught for over two years while he awaited the outcome of this proceeding. Accordingly, it is recommended that his certificate be suspended for three years retroactive to his date of retirement in February, 1986.

---

[7] Since Ferrell was allowed to retire and resign only upon the condition that he not be rehired in Dade County, it is a foregone conclusion that his effectiveness has been impaired as an employee of that particular school board.

[8] See, for example, *Turlington v Webber,* DOAH Case No. 83-1850 (DOE, June 27, 1984) (revocation appropriate where principal authorized and personally administered "hundreds" of excessive paddlings on elementary age students); *Knox,* supra (selling of cocaine justified revocation of teaching certificate); *Turlington v Wahl,* 8 FALR 125 (DOE, August 30, 1985) (revocation of certificate appropriate where teacher sexually molested 11 year old child); *Turlington v Crumiel,* 9 FALR 55 (DOE, November 4, 1986) (ten year revocation appropriate where teacher found to be incompetent).

## RECOMMENDATION

Based on the foregoing findings of fact and conclusions of law, it is

RECOMMENDED that Jack E. Ferrell be found guilty of violation Subsections 231.28(1)(c), (f) and (h), Florida Statutes (1987), as more specifically discussed in the conclusions of law, and that his teaching certificate be suspended for three years retroactive to his date of retirement in February, 1986.

DONE AND ORDERED this 4th day of May, 1988, in Tallahassee, Leon County, Florida.